The Clerk, please call the next case. The last case today is 5-15-011-02-WC, Airtex Products v. Beverly Thomas. Michael Carr for the Appellant, Philip Barrett for the Academy. May it please the Court, Counsel, my name is Michael Carr and for this argument I'm representing Airtex Products. This is an appeal on three different incidences, correct? It is, Your Honor. So could we take them, if you want, I suggest, or invite you, as the word was in the last case, to take them in a chronological order beginning with the first, the knee injury? That's fine, Your Honor. I was going to ask if I could take the shoulder case first, but we can do it that way as well. That is fine. The knee injury would have been the first at work. That's correct, Your Honor. The knee injury of December 18, 2007, Ms. Thomason hit her knee on the pole, ended up having surgery for a meniscus tear. At the time she had surgery with Dr. Heschmachor. Dr. Heschmachor found all kinds of other stuff going on in the knee. It was a bad knee. Ms. Thomason said she'll probably need a total knee replacement at some point, but released her from care. Cotsman was your expert, right? That's correct, Your Honor. So he opined that he acknowledged her injury, as I understand it, was work-related and so was the need for arthroscopic surgery as a result of the accident, but he opined the knee replacement was related to various degenerative conditions. Is that summary correct? That summary is correct, Your Honor. And Dr. Solman was their expert, right? That is correct, Your Honor. And he had a different opinion, didn't he? He did, Your Honor. Dr. Solman evaluated her six, seven years after the accident, and he concluded that the accident aggravated and exacerbated her condition in her knee, leading to the need for the total knee replacement. Well, you know what my next question is going to be. Since the Commissioner chose to bring, you know, to believe Solman over the other doctor, what are we supposed to do with this? I think in this case the... I would like and my client would like this court to look at the facts of the case, look at the fact that the condition in her knee changed between her release from Dr. Hesch-Mappour before she went to go see Dr. Benuti for the total knee replacement, and note that it's not the same condition that she's getting the total knee replacement for that resulted from the December 18, 2007 accident. The facts show, or it's our position that the facts show she had made a recovery from the injury she had sustained on December 18, 2007. The injury that led Dr. Hesch-Mappour to performing surgery and led Dr. Hesch-Mappour to releasing her from his care. During the spring of 2008, petitioners reporting to Dr. Hesch-Mappour that she's doing well, she's doing well enough to go back to work, she's doing great. She's got some residual pain, but that pain has changed. The pain that was in the front of her knee is completely gone, now it's all in the back. She's also got swelling going down in the calves. When she starts making new complaints in June of 2008, now she's got swelling in the ankle and the calf as well as around the knee. None of that was present before. I think her conditions changed enough that the manifest weight of the, and the facts showing that demonstrate that it's no longer a connected, the total knee is no longer connected to the accident. And that's why we're looking for this case to find that the facts demonstrate that the manifest weight of the evidence goes against connection in this knee case. And therefore the knee case should be kicked out. Now what about Carpal Tunnel? On Carpal Tunnel, this case involves Dr. Crandall, our expert, versus their expert, again, the good Dr. Solman. Dr. Solman testifies causation exists in this case based on her job duties. But at no point does he ever say what those job duties are. It's not clear he knows what they are. And he's evaluating her three years after the Carpal Tunnel supposedly existed without knowing what her job duties were. He's evaluating her for a number of conditions, in fact all the conditions involved in these three cases. So he produces the opinion that he needs to produce. It was related because those were her job duties. But he doesn't know what the job duties are. He never explained those. Now, arguing the commission should have, you know, exalted Crandall's opinion over Solman's, didn't the committee expressly reject Crandall's opinion and state why? They did, Your Honor. So, again, what's the problem? I think the problem is the commission incorrectly rejected Dr. Crandall's opinion because they didn't look at the facts of the case. The facts of the case show that Dr. Solman's opinion isn't supported by any facts in the case. It's not supported by anything at all. Dr. Solman just simply concludes that causation exists because of job duties that he claims to know about but are not evident to him from his report or anything else. Dr. Crandall actually looked at the facts in this case. Well, hang on a second because in rejecting Crandall's opinion, the commission says, and I quote, his conclusion, Crandall's conclusion ignores the fact that Clement returned to her job following her last surgical or following her surgical releases and worked at the job which required frequent gripping and repetitive hand motions for 16 years before she again began to experience symptoms from carpal tunnel syndrome. So they said his opinion's flawed, didn't they? That's what the commission said, yes. But the commission in doing so overlooked what Dr. Crandall did actually look at. And it's not that he didn't consider the job duties, he did. And the fact that she was working there for 16 years, but he looked at everything else, which there's no evidence that the commission nor Dr. Solman did. She's diabetic. She has a hypothyroid problem. She's got thoracic outlet syndrome. Petitioner herself described it as easy work. Well, the evidence was conflicting. Going back again, the commission could possibly have adapted Crandall's, but they decided not to. They did, against what I would argue is the manifest weight of the evidence in the record. Okay. Why don't we get to your main opening event, the right shoulder injury. All right. In this case, we're disputing it for two reasons, accident and causation. We'll go to accident first. On July 27, well, in the months leading up to July 27, 2011, Ms. Thomason had had a number of problems with her shoulder. She even had an MRI which shows through and through tears. She had had three injections into that shoulder. Dr. Lee had discussed with her the possibility of undergoing surgery for her shoulder. He presented it as an option. Petitioner testified at 10 o'clock on July 27, she had a new accident involving her shoulder, stacking the skids. The record then shows 26 minutes later at 10.26, she called Dr. Lee's office. She called Dr. Lee's office saying she had had an injection to her right shoulder on 6.6.11 and is now having a lot of pain and redness to the shoulder, wants to know what she needs to do. Despite having an accident 26 minutes earlier, she tells no one about it at Dr. Lee's office. It's not in the note. In fact, later on in the other phone notes, there's no reference to an accident. What date did the accident allegedly happen at? July 27, 2011. Okay. And she called Dr. Lee's office 26 minutes later, after the accident allegedly occurred at 10 o'clock in the morning, saying she had had an injection, is now having a lot of pain and redness, wants to know what to do. It's not disputed that she saw Lee the next day, right? That's correct, Your Honor. He took her off work and recommended surgery. That's correct. And so what's the problem with that? The problem is the commission discounted the testimony of our witness, Jeff Jake, based on the timing of everything that occurred on July 27, 2011. They specifically found Mr. Jake was not credible because no appointment had been made for the next day, according to the commission's reading of the facts, until 3 o'clock on the day of the accident at the earliest. It's for that reason that they completely discounted Mr. Jake's testimony and found that it was the petitioner's testimony which is most internally consistent with the facts as they were presented. Our position is, and the testimony from Mr. Jake, is that no accident actually occurred on July 27, 2011. In spite of the fact that the claimant testified to it and Lee's records indicate that she called him, right? That's correct. How do we substitute our judgment for that of the commission on those issues? You substitute it here because a look at the facts of this case demonstrates the commission got it wrong. The commission got it wrong when they determined that Mr. Jake was not credible based on the timing of everything that happened on July 27, 2011. But isn't the case already complete with a well-settled principle we don't substitute our judgment for that of the commission's on credibility issues? How do we get around that rule? You get around it because the weight of the evidence here demonstrates that the commission got it wrong. You can step in and make decisions regarding facts and evidence when the facts that the commission has inferred or drawn go against the manifest weight of the evidence. And that's what we're alleging happened here. Not only does she not tell Dr. Lee's office about an accident that occurred 26 minutes earlier, she then testifies that she goes to find the respondent's safety person who goes to lunch at noon but was already gone. There's plenty of time here in between when this accident supposedly occurred and when she finally goes to find somebody. And when she does, she eventually finds Mr. Jake and that's where we start getting into disputes over whose testimony is more credible and supported by the facts in this case. And as I pointed out to Mr. Justice Hudson, we believe, and it's pointed out in the briefs, that the most logical story is that she did not actually sustain an accident on July 27. And that she came up with that when she went to see Dr. Lee the next day. And that was when she decided that she had had an accident which was related to her work requiring workers' compensation to pay for the shoulder surgery that was eventually performed. But going to causation in the shoulder case, this is somebody who's already had a recommendation for surgery, has had an MRI arthrogram showing serious problems in that shoulder, has undergone three injections already. I think the commission got it wrong when they said the petitioner was constantly demurring surgery or wanted to put surgery off and her condition changed leading up to July 27, 2011 because nothing did change. For that reason, I would submit that the commission erred in finding causation with respect to that shoulder case. Thank you, counsel. Counsel, you may respond. Thank you. May it please the court, counsel. All three cases, again, deal with the manifest waive as you indicated. The commission had the opportunity to view, the arbitrator viewed the witnesses, the commission reviewed the transcripts in terms of the ways to be accorded, the experts, the witnesses in this case, and made their determinations. We believe that the record does not support that any of the decisions are against the manifest waive of the evidence in this case. And I'd be happy to go through it chronologically. Starting with the December 18, 2007 accidents, there's ample evidence that that's a causal connection issue. There's ample evidence to support the commission decision. Dr. Pannutti in April of 2008 indicated that the knee was related to, I'm sorry, February 2010, indicated that the claimant fell at work, her client fell at work and had a total knee replacement. The chronological events in this case, temporal sequence of events, indicate this is what happened. Our client never had any problem before the December accident, had the accident, continued to have problems afterwards. Significantly, after the knee surgery, before the knee replacement, the record indicates that our client complained of pain to the point where the surgeon indicated she was going to need a total knee replacement. There was no intervening act between the first surgery and the second surgery, and we believe there was sufficient evidence for the commission to find that the total knee replacement, just based on Dr. Pannutti's records, as well as the temporal sequence of events, supports the commission. But, of course, the most significant evidence is Dr. Solomon. He was our expert. He examined our client five years after the accident, reviewed all the information, all the medical records, and found there was a causal relationship. So we would ask that you affirm the commission decision. Turning to the carpal tunnel, the second case, with an accident date of May 7, 2010. Again, Dr. Solomon found that the repetitive work activities, which are unrebutted, played a causative role in the development of the carpal tunnel syndrome and the cubital tunnel syndrome, and that evidence was in the record. We believe that was sufficient for the commission to find that there was causation in this case, and their decision is not against the manifest weight of the evidence. The third accident, as counsel indicated, is the one that was most contentious in this case. There were witnesses on both sides. Our client testified, and Mr. Jake testified. The arbitrator and the industrial commission had an opportunity to weigh all the evidence in the providence of the commission. To weigh the evidence they did, they found that, in this case, Ms. Tominson's testimony and description was credible, believable, and outweighed the testimony of Mr. Jake. For that reason, found causation, or found accidents. In regards to causation, again, the commission relied upon Dr. Solomon, where he indicated that the accident played a role in the surgery that was ultimately performed in this case. And we, again, based on that information, believe there was sufficient evidence to establish that the decision was not against the manifest weight of the evidence. So, in conclusion, we would ask that all three claims, cases, be affirmed in their entirety. Thank you. Thank you, counsel. Counsel, you may reply. Briefly, Your Honors, in the knee case, Dr. Bernudi issued no opinion on causation. The only opinion finding causation for the knee case was the one from Dr. Cohen, given seven years after the accident occurred. Dr. Bernudi was specifically asked to provide a causation opinion, and he declined to do so, deferring to Dr. Heschmachor, who likewise didn't produce a causation opinion in this case. So, the only causation opinion in the knee case comes from Dr. Cohen, again, seven years after the accident occurred. In the carpal tunnel case, Dr. Crandall is the only doctor who has records and petitioner's job duties. We would argue the manifest weight of the evidence goes towards more Dr. Crandall for having done that research and has that background information, as well as the information regarding all her other conditions than to Dr. Cohen, who, again, made causation based on job duties that only he knows. With respect to the shoulder case, we've already talked about the testimony as it relates to accident on causation. Nothing changed on July 27, 2011, with respect to her shoulder complaints. She rated her shoulder pain the exact same, both between and after the alleged accident occurred, and Dr. Lee testified there was no way to know whether or not anything he operated on was acute versus chronic. Given all the problems she had had before, including a discussion of whether or not she would need surgery, we would argue the manifest weight goes to a finding that causation does not exist for that shoulder case and would request that case be reversed. Thank you. Thank you, Counsel Polis. This matter was taken under advisement and a written disposition shall issue. The Court will stand at recess until 9 a.m. tomorrow morning.